UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Champagne Louis Roederer,

       Plaintiff,

v.                                                                    Civil No. 06-213 (JNE/SRN)
                                                                      ORDER
J. Garcia Carrion, S.A.,
and CIV USA,

       Defendants.

———————————————————————————————————————

Allen W. Hinderaker, Esq., Heather J. Kliebenstein, Esq., and John A. Clifford, Esq., Merchant & Gould P.C., appeared for Plaintiff Champagne Louis Roederer.

Alan L. Kildow, Esq., and Sonya R. Braunschweig, Esq., DLA Piper US LLC, appeared for Defendants J. Garcia Carrion, S.A., and CIV USA.

———————————————————————————————————————

Champagne Louis Roederer (CLR) brought this action against Defendants J. Garcia Carrion, S.A. (Carrion), and Friend Wine Marketing, Inc., d/b/a CIV USA, alleging trademark infringement and related claims and seeking a permanent injunction. Defendants moved for summary judgment on the ground that CLR's claims are barred by the doctrine of laches. For the reasons discussed below, the Court grants the motion.

## I.  BACKGROUND

*Carrion, Jaume Serra, and Cristalino cava*

Carrion, a Spanish corporation, is owned by Priesca, another Spanish corporation. The stock of Jaume Serra, a Spanish winery, was purchased by Priesca in April 1997. In August 1998, Jaume Serra purchased the stock of Carrion, and the two companies merged, with the resulting entity operating under the Carrion name.

The Jaume Serra winery first began to make cava—a type of wine with bubbles—in 1984 and first used some variation of the name "Cristalino" for a cava sometime before 1987.[1] By 1989, Cristalino cava was being sold in the United States.  Early sales volumes were small, but by 1997 annual U.S. sales had grown to nearly 400,000 bottles and Cristalino was carried by distributors around the nation.

CIV USA began importing wine from Jaume Serra into the United States in 1991 or 1992.  In addition to its duties as importer and distributor, CIV USA serves as the marketing and business arm for Carrion in the United States.

Cristalino cava was initially labeled as "Cristalino Jaume Serra" cava.  For example, the label depicted below was used in approximately 1992:



In approximately 1993, the words "Jaume Serra" were de-emphasized on the Cristalino label, leaving the label prominently featuring the word "Cristalino."  Since that time, the primary label on bottles of Cristalino cava has appeared without significant change as is represented below:

---

[1]     Jaume Serra previously used the Cristalino mark on still wine, that is, wine without bubbles.



Carrion currently produces a separate cava brand called "Jaume Serra."  At present, Carrion produces three different brands of cava, plus several "private label" cavas for retailers.

After the merger of Jaume Serra and Carrion in 1998, Carrion began to modernize and expand the winery facilities, a project that ultimately cost almost 14 million euros.  The improvements involved the winery generally and were not specifically targeted toward production of Cristalino cava.  Carrion's production capacity of all types of cava increased from about 4 million bottles in 1997 to about fifteen million bottles in 2003.

Sales of Cristalino cava continued to grow after Carrion and Jaume Serra merged.  Annual U.S. sales of Cristalino cava in the years 1999 to 2001 were approximately 700,000 bottles.  U.S. sales in 2002 broke the one-million-bottle mark, and Carrion currently sells well over three million bottles of Cristalino cava annually in the United States.  Sales of Cristalino in the United States now constitute about 27% of Carrion's total cava production, and Carrion sells about one-third of its cava—counting all its cava brands—in the United States.  Carrion is presently among the very largest exporters of cava to the United States.

These increased sales coincided with increased publicity.  Cristalino was given minor but positive reviews by *Wine & Spirits* in 1991 and by *The Wine Spectator* and *San Francisco Independent* in 1993.  Cristalino cava continued to be reviewed or mentioned in these and other

publications in subsequent years, and the frequency with which Cristalino was mentioned in U.S. publications began to grow significantly by 1999 and 2000.

Defendants have actively marketed Cristalino cava in the United States as a "value brand," *i.e.*, as a wine offering good quality for its price.[2]  CIV USA first ran ads in *Wine Spectator* and *Wine Enthusiast* in 1999 and subsequently ran several print ads for Cristalino each year.  CIV USA entered Cristalino in various contests and trade shows and submitted Cristalino for review and scoring in *Wine Spectator*, *Wine & Spirits*, and *Wine Enthusiast*.  Cristalino has also been the subject of price promotions, sampling promotions, and "label advertising."

*CLR and objections to the Cristalino mark*

CLR is a wine producer incorporated under the laws of France.  CLR produces, among other things, an expensive champagne that is sold under the name "Cristal."  Created in 1876 as the official wine of the Imperial Court of Russia for Tsar Alexander II, Cristal is sold in distinctive, flat-bottomed, crystal bottles.  Cristal champagne has been sold in the United States for decades, and CLR has registered the trademark "CRISTAL CHAMPAGNE" and the trademark and design "CRISTAL CHAMPAGNE LR."  The primary label on bottles of Cristal champagne, as represented in CLR's briefing, is reproduced below:

---

[2]     Though the existence of marketing efforts by Carrion and CIV USA has been established, the dollar amounts spent on building the Cristalino brand are unclear.  The Court is unable to ascertain whether the marketing expenditures mentioned in the record relate solely to Cristalino cava or instead also include amounts spent on marketing other wines produced by Carrion or distributed by CIV USA.  In addition, the dollar amounts identified do not appear attributable solely to expenditures that are properly classified as marketing and advertising.



CLR has in the past opposed registration of "Cristalino" and similar marks by Carrion and Jaume Serra in various non-U.S. jurisdictions. For example, CLR opposed registration of "CRISTALINO JAUME SERRA" in Spain in 1982, "CRISTALINO" in Spain in 1990, "CRISTALINO JAUME SERRA" in Colombia in 1991,[3] and "CRISTALINO" in the European Union in 2004.

In August of 1995, through participation in unrelated proceedings not involving Defendants before the United States Patent and Trademark Office (PTO), CLR's trademark attorneys received an affidavit indicating that "a sparkling wine from Spain called Cristalino" had been found on sale at a Cost Plus store in California on June 8, 1995. The affidavit further noted that the wine label stated that it had been bottled by Jaume Serra, and a photo of the bottles was attached to the affidavit. Though he now asserts he does not remember seeing the original affidavit, CLR's vice president executed an affidavit in response. CLR did not object to the use of the Cristalino mark at that time.

On June 24, 1997, pursuant to an application by Jaume Serra, the "CRISTALINO JAUME SERRA" mark was published for registration in the PTO's *Official Gazette*. CLR filed two requests for extension of time to file an opposition, but ultimately no opposition was filed. The application never matured to registration, and it was deemed abandoned on August 9, 2000.

---

[3]     According to CLR, opposition in Colombia was abandoned after nine years and before a decision on the merits was reached "because of procedural complexities."

On July 10, 2000, Carrion filed an application to register the "CRISTALINO" mark for alcoholic beverages with the PTO, and the application was published on February 5, 2002. CLR sent letters in June and July 2002 to Carrion demanding that Carrion withdraw the trademark application and cease using the Cristalino mark for wines, sparkling wines, and champagne. After several extensions of time, CLR filed its opposition to the Cristalino mark in February of 2003. CLR filed the present lawsuit on January 16, 2006, asserting claims for trademark infringement, false designation, dilution, common law unfair competition, and violation of the Minnesota Deceptive Trade Practices Act. CLR's opposition to Carrion's trademark application was subsequently stayed in favor of this lawsuit.

## II.  DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendants argue that CLR's claims are barred by the doctrine of laches.  Laches is an equitable defense to an action to enforce a trademark.  *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999); *see AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 822 (7th Cir. 2002) (indicating laches may apply bar claims of trademark dilution); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 842-43 (9th Cir. 2002) (applying laches to state law claims for unfair competition and false advertising); *Viking Automatic Sprinkler Co. v. Viking Fire Prot. Co.*, 159 N.W.2d 250, 264 (Minn. 1968) (indicating that laches may bar a claim for common law unfair competition); *Aronovitch v. Levy*, 56 N.W.2d 570, 574 (Minn. 1953) ("[I]n equitable actions the doctrine of laches applies even though the action is governed by a statute of limitations.").  "Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time."  *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir. 1980) (quotation omitted); *see Hubbard Feeds*, 182 F.3d at 602; *Studer v. Kiffmeyer*, 712 N.W.2d 552, 557 (Minn. 2006).  Application of the doctrine of laches "turn[s] on a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties."  *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002) (quotation omitted).

*Standing to assert laches*

CLR argues that Carrion lacked standing to assert laches until its merger with Jaume Serra in 1998.  While no specific documentation related to acquisition of trademark rights has been identified, the evidence indicates that Priesca purchased the entire business of Jaume Serra in 1997, including rights to the Cristalino mark.  *See Okla. Beverage Co. v. Dr. Pepper Love*

*Bottling Co.*, 565 F.2d 629, 632 (10th Cir. 1977) ("No particular words are necessary for the assignment [of trademark rights] when the business and the goodwill are transferred to another who continued the operation under the same trademark."); *U.S. Ozone Co. v. U.S. Ozone Co. of Am.*, 62 F.2d 881, 886 (7th Cir. 1932) ("[W]hen the business to which [the trademark rights] relate is sold intact by the trustee, they pass in connection with the sale of the business to the purchaser without being specifically mentioned."); Restatement (Third) of Unfair Competition § 34 (1995).  In addition, because Jaume Serra acquired Carrion in 1998, no transfer of rights to the Cristalino mark was involved.  As a result, Carrion, as currently constituted, stands in the shoes of the original Jaume Serra winery when asserting rights in the Cristalino mark.  *See Premier Dental Products Co. v. Darby Dental Supply Co., Inc.*, 794 F.2d 850, 853 (3d Cir. 1986) ("[F]ollowing a proper assignment [of trademark rights], the assignee steps into the shoes of the assignor.").

Relatedly, CLR contends that, while CIV USA is a proper defendant, CIV USA is an importer with no property interest in the Cristalino mark and is therefore unable to assert laches. The authorities cited by CLR do not so indicate, and the Court concludes that CIV USA may rely on the defense of laches.  Exercise of trademark rights is not limited to trademark owners.  *See* 15 U.S.C.A. § 1125(a) (West 1998 & Supp. 2008) (permitting civil action for false advertising "by any person who believes that he or she is or is likely to be damaged"); *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir. 1977) (stating that a non-exclusive licensee of a trademark may have standing to sue under 15 U.S.C. § 1125).  Accordingly, "if a third party permits a defendant to use a trademark as part of a contractual arrangement, the defendant can avoid liability for trademark infringement by invoking the superior trademark rights of the third party."  *Lapinee Trade, Inc. v. Paleewong Trading Co.*, 687 F. Supp. 1262, 1264 (N.D. Ill.

1988).  Moreover, it seems that a defendant who would be in a position to assert a statute of limitations defense, were it available, should also be able to assert its equitable counterpart, that is, laches.  *Cf. Jarrow Formulas*, 304 F.3d at 835-36 ("Laches serves as the counterpart to the statute of limitations, barring untimely equitable causes of action.").

*Laches*

Here, CLR had knowledge of use of the Cristalino mark on Jaume Serra's cava no later than 1995, when CLR received notice through its participation in unrelated PTO proceedings.[4] However, CLR did not object until 2002, a delay of nearly seven years.  *Cf. Hubbard Feeds*, 182 F.3d at 602 n.5 ("[A] delay of over four years is sufficient for laches.").  This period of delay exceeds the analogous statute of limitations.  *See* Minn. Stat. § 541.05 (2006) (indicating that a six-year limitations period applies to fraud claims, statutory claims, and other claims); *cf. Reynolds v. Heartland Transp.*, 849 F.2d 1074, 1075-76 (8th Cir. 1988) ("[T]he period prescribed in an analogous statute of limitation is a rough rule of thumb in considering the question of laches, and constitutes a pertinent factor in evaluating the equities.").

In addition, Carrion will be prejudiced if CLR is permitted to assert its rights after such a delay.  In the nearly seven-year period between the time CLR learned of use of the Cristalino

---

[4]      Knowledge of the relevant affidavit, and consequently notice of use of the Cristalino mark, by attorneys enforcing CLR's trademark rights is imputed to CLR.  *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 363 (2d Cir. 1959) (stating, in the context of a trademark infringement lawsuit, that "[i]n order to impute an agent's knowledge to a principal in a particular transaction, it must be shown that the agent at some time had some duties to perform on behalf of the principal with respect to the transaction, although the agent need not have acquired his knowledge in connection with those duties."); 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.39 (4th ed. 2008) ("In order to impute an agent's knowledge to a principal, it must be shown that the agent had duties with respect to trademark matters.").  While the copy submitted into evidence in this case of the photograph attached to the affidavit is of poor quality, the word "Cristalino" is clearly visible on the bottle labels.  The Court concludes the affidavit constitutes adequate notice of the Cristalino mark.  *See ProFitness Physical Therapy Ctr.*, 314 F.3d at 70 (indicating that the laches period begins when the plaintiff "knew or should have known" of the circumstances giving rise to its infringement claim).

mark and the time CLR objected by letter in 2002, Defendants marketed Cristalino cava,

expanded production, and were rewarded when Cristalino grew to become a highly successful

brand of cava.  While Carrion's cava production facilities and CIV USA's distribution abilities

could, as CLR observes, be used on a cava sold under a different mark, Defendants would lose

the benefit of any brand loyalty or brand recognition and be forced to begin anew.  That is a

circumstance that Defendants assert would have a devastating effect on sales.  Had CLR asserted

its rights earlier, Defendants could have directed their efforts to building good will towards a

different mark.  *See Jarrow Formulas*, 304 F.3d at 839 ("If Jarrow had filed suit sooner,

Nutrition Now could have invested its resources in shaping an alternative identity for PB8 in the

minds of the public."); *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002)

("[H]ad the plaintiff successfully pressed its claim in a timely manner, the defendant could have

invested its time and money in other areas or simply renamed its products.").

 CLR argues that any delay should be excused by the fact that any early infringement by

Defendants did not rise to the level of a trademark violation.  "[T]he owner [of a trademark] has

no obligation to sue until the likelihood of confusion looms large."  *Sara Lee Corp. v. Kayser-

Roth Corp.*, 81 F.3d 455, 462 (4th Cir.1996) (quotations omitted).  Indeed, the law does not

require trademark owners to be trigger happy with infringement lawsuits.  "[D]elay is to be

measured from the time at which the plaintiff knows or should know she has a provable claim for

infringement."  *Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1206

(11th Cir. 1997); *see Sara Lee*, 81 F.3d at 462 (indicating that a plaintiff may properly "delay its

pursuit of a remedy until its right to protection had clearly ripened").  Accordingly, when laches

is asserted, the doctrine of "progressive encroachment" may require a court to measure a

plaintiff's delay in asserting its rights from some point *after* the first instance of infringement.

*See Kason Indus.*, 120 F.3d at 1205. "Under this doctrine, where a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff, the plaintiff's delay is excused." *Id.*; *see* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.19 (4th ed. 2008) ("While a slow, steady increase in the level of business attributable only to the normal growth of any business may not always be sufficient to excuse a prior delay, any change in the format or method of use of the mark or expansion into new product lines or territories should be sufficient to excuse a prior delay.").

While sales of Cristalino cava have grown over time, the evidence shows that sales of Cristalino have been greater than sales of Cristal since at least the mid-1990's.[5] Carrion and Jaume Serra have made quality control changes to improve the consistency of Cristalino cava, but evidence of significant changes in the quality of the cava is lacking. In addition, the record reveals that, while the labels on Cristalino cava have evolved to emphasize the word "Cristalino," such changes were largely complete by 1993. The Court concludes that neither the lower but still significant sales volumes of Cristalino in the mid-1990's, the implementation of quality control measures, nor the 1993-era changes to the Cristalino label are sufficient to create a genuine issue of material fact that would permit CLR to avoid application of laches. The mere possibility that older-style labels may have continued to appear for some unknown period of time as older inventory was depleted or evidence that an older label may have been featured on CIV USA's website at a later time are not so weighty as to change the Court's conclusion. *See*

---

[5]    While, as CLR asserts, the record does not contain precise data regarding Cristalino sales for some years, the record does not reveal grounds to doubt the general accuracy of Carrion's figures.

*F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997) ("[A] nonmovant must present more than a scintilla of evidence . . . to create a genuine issue of material fact for trial." (quotation omitted)).

*Laches as a bar to injunctive relief*

CLR argues that, even if CLR unreasonably delayed in asserting its rights, laches should not be applied to bar prospective injunctive relief.  "It has often been said that laches is generally not a bar to prospective injunctive relief."  *Jarrow Formulas*, 304 F.3d at 840; *see Reid, Murdoch & Co. v. H.P. Coffee Co.*, 48 F.2d 817, 821 (8th Cir. 1931); *Layton Pure Food Co. v. Church & Dwight Co.*, 182 F. 35, 41 (8th Cir. 1910).  Despite such statements, courts can and do apply the doctrine of laches to bar injunctive relief.  *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001) (noting that while laches "typically" will not bar an injunction, there is no such absolute rule); *Layton Pure Food Co.*, 182 F. at 41 (noting that laches may bar an injunction in "exceptional cases"); *cf. Hubbard Feeds*, 182 F.3d at 602 (indicating that laches may apply to bar preliminary injunctive relief).  For example, laches has been held to bar prospective injunctive relief where, as in the present case, a plaintiff's delay permits the defendant to build up a product image or identity around a component that the plaintiff then seeks to change.  *See Jarrow Formulas*, 304 F.3d at 840 ("Nutrition Now would be prejudiced if forced to abandon its long-term investment in its presentation of PB8 to the public. Therefore, laches bars Jarrow's claim for prospective injunctive relief."); *Chattanoga Mfg., Inc.*, 301 F.3d at 795; *cf. Citizens & Landowners Against the Miles City/New Underwood Powerline v. Sec'y, U.S. Dep't of Energy*, 683 F.2d 1171, 1175 (8th Cir. 1982) ("Although laches is not favored in environmental cases, it is properly invoked when a party seeking injunctive relief has engaged in unreasonable and inexcusable delay which results in undue prejudice to the other party.").  Here, the Court concludes that, given the balance of equities, mechanical application of a rule shielding

requests for injunctive relief from the doctrine of laches is inappropriate.  *See U.S. Jaycees v. Cedar Rapids Jaycees*, 794 F.2d 379, 382 (8th Cir. 1986) (stating, in an action to enjoin unauthorized use of a trademark, that "the grant of injunctive relief is not a ministerial act" and indicating that a court should consider "not only the nature of the asserted right, but also the conduct of the plaintiff in seeking to enforce that right, the burden that the requested relief will impose on the defendant . . ., and the impact on the public interest." (citations omitted)); 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.6 (4th ed. 2008) ("[T]he better view is that in all such cases the court should weigh the competing equities which bear on the issue of delay and should then grant or deny injunctive relief depending on the overall balance of those equities." (quotation omitted)).

*Laches and the public interest in freedom from confusion*

In addition, CLR advances the related argument that, should laches otherwise be applicable, laches should not bar injunctive relief because the public maintains an interest in being free from confusion in instances of trademark infringement.  The harm that would be inflicted on the public by continued use of two clearly confusing marks is indeed relevant in determining whether laches should bar a request for injunctive relief in an action for trademark infringement.  *See San Francisco Ass'n for the Blind v. Indus. Aid for the Blind*, 152 F.2d 532, 537 (8th Cir. 1946) ("The public has a substantial interest in being protected against the confusion which results from the use of similar trade-marks on similar goods in the same trade territory.").  Courts considering this factor typically will decline to apply laches to bar injunctive relief only when some elevated likelihood of confusion is demonstrated.  *See ProFitness Physical Therapy Ctr.*, 314 F.3d at 68 ("[A] court may nonetheless grant injunctive relief if it determines that the likelihood of confusion is so great that it outweighs the effect of plaintiff's

delay in bringing suit."); *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 423

(4th Cir. 1998) ("[S]trong proof of likelihood of confusion—indeed, actual confusion—trumps

the defenses of laches and acquiescence."); *SunAmerica Corp. v. Sun Life Assurance Co.*, 77

F.3d 1325, 1334 (11th Cir. 1996) (indicating that a showing of "inevitable confusion" is

required); *cf. Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d

1102, 1111 (9th Cir. 2006) (indicating that both inevitable confusion and a threat to public safety

are required).  This elevated standard "does not lend itself to a formulaic, mechanical definition,"

though the level of confusion required appears to be at least "an increment higher than that

required for a finding of a likelihood of confusion."  *SunAmerica Corp.*, 77 F.3d at 1335 n.3

(quotation omitted).

In this case, the evidence of likelihood of confusion consists of the similarity between the

product's names, the fact that both Cristal and Cristalino are sparkling wines that are sold nation-

wide, one incident in which a bottle of Cristalino was sold as Cristal after the label had been

altered to obscure the "ino" in Cristalino, and photos and written passages taken from the internet

featuring individuals discussing both Cristal and Cristalino or pretending that bottles of

Cristalino are bottles of Cristal.  *Cf. SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1089-90 (8th Cir.

1980) (examining similar factors to determine likelihood of trademark confusion).  In addition,

CLR submitted the results of a survey indicating some confusion among potential consumers.

The survey, which was conducted by a third-party research and consulting agency in shopping

malls in various cities around the country, ultimately included the responses of 130 likely buyers

of imported sparkling wine who were familiar with the Cristal brand.[6]  Survey participants were

---

[6]     Another 112 respondents were part of a control group for which a bottle labeled
"Courtalino" was substituted for Cristalino.

first shown a bottle of Cristal.  Then the bottle of Cristal was removed, and participants were presented with an array of four other bottles of sparkling wine, including a bottle of Cristalino. Participants were then asked, in relation to the bottle of Cristal, whether they saw the same brand of sparkling wine among the array, whether they saw a sparkling wine produced by the same company, whether they saw a sparkling wine affiliated with the company that produced the first bottle, and whether permission from the company that made the first bottle was required to produce any of the sparkling wines in the array.  The results indicated that 6.9% of respondents believed the bottle of Cristalino was the same brand as the bottle of Cristal, 9.2% believed Cristal and Cristalino were produced by the same company, 4.6% believed the Cristal and Cristalino were produced by affiliated companies, and 2.3% believed that permission from the maker of Cristal was required in order to produce Cristalino.

On this record, the Court concludes that confusion between Cristalino and Cristal is not inevitable and the likelihood of confusion is not so high as to prevent application of laches to CLR's request for injunctive relief and that, on that issue, no genuine issue of material fact remains.  The two products are sold at dramatically different prices.[7]  While the names and labels of the two sparkling wines are similar, they are plainly not identical:

---

[7]     "Unlike cases of traditional trademark infringement, in dilution cases there is no strong policy of consumer confusion to weigh against dismissal or narrowing of relief due to the equities created by delay or acquiescence."  4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24.130 (4th ed. 2008); *see* 15 U.S.C.A. 1125 (stating that injunctive relief on dilution claims is "[s]ubject to the principles of equity" and may be awarded without regard for "the presence or absence of actual or likely confusion, of competition, or of actual economic injury").

 

*Compare Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (indicating that concurrent use of the words "Angel Flight" paired with slightly different wing logos was inevitably confusing) *with Swank, Inc. v. Ravel Perfume Corp.*, 438 F.2d 622, 623-24 (C.C.P.A. 1971) (concluding that the public interest in freedom from confusion does not bar application of laches in a case involving the marks "Jade East" and "Green Jade" on lines of men's toiletries).  Cristal is sold in a distinctive bottle, while Cristalino is not.  Aside from the single incident involving altered labels, there appears to be no direct evidence of confusion in the marketplace.  *Cf. Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983) ("[N]o evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal." (footnote omitted)).  Indeed, while the photos and written passages taken from the internet and submitted by CLR indicate that people recognize some similarity between the Cristalino and Cristal names, none suggest that the individuals involved actually confused Cristalino with Cristal.  Moreover, CLR's delay in asserting its rights indicates that confusion is unlikely.  *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 265 (5th Cir. 1980); *see also Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1104 (9th Cir. 2004) (indicating delay may allow public to differentiate between similar marks).  The evidence does not lead to an inference that Defendants intended to

16

capitalize on any similarity between the Cristalino and Cristal marks.  Finally, regarding the

survey commissioned by CLR, "[g]enerally, figures in the range of 25% to 50% have been

viewed as solid support for a finding of a likelihood of confusion."  6 J. Thomas McCarthy,

McCarthy on Trademarks and Unfair Competition § 32.188 (4th ed. 2008).  While CLR's survey

is probative of a possibility of confusion, the Court concludes that, in light of the other available

evidence, a higher confusion rate on this survey would be required to establish an issue of

material fact as to the existence of "inevitable confusion."

*Conclusion*

The Court concludes that CLR, after learning of the circumstances that give rise to its

claims, unreasonably delayed in asserting its rights.  The Court further concludes that Defendants

would be unduly prejudiced if CLR were permitted to assert its rights at this time and that laches

should bar CLR's claim for injunctive relief.  Therefore, IT IS ORDERED THAT:

1.     Defendants' Amended Motion for Summary Judgment [Docket No. 153]
       is GRANTED.

2.     The Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July 23, 2008

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge